```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED:    1 30 15      │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DERICK JOHNSON,                                      :
             Plaintiff,                            :    **REPORT AND**
                                    :    **RECOMMENDATION**

   -v.-                                              :

                                      :    14-CV-2334 (CM) (JLC)

CAROLYN W. COLVIN,                                   :
Acting Commissioner of Social Security,              :
             Defendant.                            :

------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Colleen McMahon, United States District Judge:**

      *Pro se* plaintiff Derick Johnson seeks judicial review of a final determination by the

Commissioner of Social Security ("Commissioner"), denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The Commissioner has

moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), to

which Johnson submitted no opposition. For the reasons set forth below, I recommend that the

Commissioner's motion be denied, and the case be remanded to the Commissioner for further

proceedings.[1]

*MEMO ENDORSED*

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED:    6/1/15       │
└─────────────────────────────┘
```

Copies mailed / faxes / handed to counsel on 6/1/15

---

[1] "Although a remand request is normally made by a party, there is no reason why a court may
not order the remand *sua sponte*." *Armstrong v. Colvin*, No. 12-CV-8126 (VB), 2013 WL
6246491, at *2 n.1 (S.D.N.Y. Dec. 3, 2013) (quoting *Clark v. Callahan*, No. 96-CV-3020
(SAS), 1998 WL 512956, at *1 (S.D.N.Y. Aug.17, 1998)).

6/1/2015 No objections have been filed to this report. I accept it
and adopt it as the opinion of the Court. The Commissioner's
motion for judgment on the pleadings DENIED – case remanded
to Commissioner for further proceedings Co

# I.     BACKGROUND

## A.     Procedural History

Johnson filed an application for DIB on October 24, 2011.  Administrative Record ("R.")
at 97-100.[2]  Johnson also filed an application for SSI on November 8, 2011.  *Id.* at 88-96.
Johnson claimed disability beginning on November 10, 2010 due to Human Immunodeficiency
Virus ("HIV"), hypertension, and lower back pain.  *Id.* at 109.  The Social Security
Administration ("SSA") denied both of his applications on January 9, 2012.  *Id.* at 39-44.  On
February 29, 2012, Johnson filed a request for a hearing before an Administrative Law Judge
("ALJ").  *Id.* at 45-47.  Appearing with a non-attorney representative, Johnson testified at a
hearing held before ALJ Jerome Hornblass on November 27, 2012.  *Id.* at 20-31.  The ALJ found
that Johnson was not disabled and denied his claims in a written decision dated January 8, 2013.
*Id.* at 8-19.  The SSA Appeals Council received Johnson's request for a review of the ALJ's
decision on February 25, 2013, *id.* at 5-7, and denied review on February 11, 2014, *id.* at 1-4,
rendering the ALJ's determination the Commissioner's final decision.

Johnson timely commenced the current action on March 26, 2014, seeking judicial
review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  *See*
Complaint ("Compl.") (Dkt. No. 2).  On September 22, 2014, the Commissioner filed her
Answer and moved for judgment on the pleadings pursuant to Rule 12(c).  *See* Notice of Motion
for Judgment on the Pleadings (Dkt. No. 9); Memorandum of Law in Support of Judgment on the
Pleadings (Dkt. No. 10).  Johnson did not submit any response in opposition to the motion.

---

[2] The administrative record consists of one docket entry with eight attached supplemental
documents.  (Dkt. Nos. 12 to 12-8).  For clarity and consistency, citations to the record will
refer to the pagination which runs sequentially throughout the various entries and is marked in
bold in the lower right-hand corner.

**B.      The Administrative Record**

**1.      Johnson's Background**

Johnson was born on November 20, 1963, and was 46 years old on the onset date of his alleged disability. R. at 88. Johnson lives in the Bronx, New York, has completed high school, and has never been married. *Id.* at 88-89, 110. In his application, Johnson described his work history, which includes various positions in warehouses, working as a mover for a moving company, and, most recently, working as a supermarket stock clerk from 2009 until 2010. *Id.* He stopped working at his most recent job because "it was slow." *Id.* at 109.

Johnson's claims for DIB and SSI are based on physical impairments: HIV, lower back pain, and hypertension. *Id.* Johnson was diagnosed as HIV positive in 1999, but does not take any medication for it. *Id.* at 112, 193. Johnson said that he began to experience lower back pain sometime in 2008, *id.* at 166, although he continued working until November 2010. *Id.* at 109. Johnson asserted that, as of November 2011, this lower back pain prevented him from "standing for long periods of time." *Id.* at 126. Finally, Johnson has high blood pressure, and has been taking medication for it at least since 2009. *Id.* at 166, 193. During his administrative hearing, Johnson also testified about knee pain which sometimes prevents him from getting out of bed. *Id.* at 25.

At his hearing and in his submissions to the SSA, Johnson described his daily activities. *Id.* at 20-31, 115-23. He said that he spends most of the day at home watching television and occasionally goes for walks in a park near his house. *Id.* at 30. He is able to take public transportation without assistance. *Id.* at 27. Johnson also said that he regularly cooks; is able to shop, clean, and do his own laundry; and exercises and attends sports events and church. *Id.* at 115, 117, 119.

3

### 2.    Medical Evidence

#### a.    Treatment at Woodhull Medical and Mental Health Center

##### i.  Inpatient Hospital Records

From September 12-19, 2011, Johnson underwent detoxification for heroin dependence at

Woodhull Medical and Mental Health Center ("Woodhull"). *Id.* at 147-56, 161. At intake,

Johnson had high blood pressure, but his cardiovascular and respiratory systems were normal.

*Id.* at 151. A transthoracic echocardiogram performed during Johnson's hospitalization revealed

normal cardiac function with mild hypertrophy in the left ventricle. *Id.* at 192. The doctor also

noted that Johnson was morbidly obese. *Id.* at 151.

Johnson was discharged on September 19 with diagnoses of opiate dependence, HIV

positive status, and hypertension. *Id.* at 148-49. His discharge papers noted that Johnson's

Global Assessment of Functioning ("GAF") score was 65 and that his physical activity was not

restricted. *Id.* at 149.[3]

##### ii.  Santangelo Treatment Notes

The record also contains treatment notes from an outpatient visit at Woodhull on October

3, 2012 where Johnson was seen by Valerie Santangelo, a nurse practitioner. *Id. at* 191-201. In

these notes, Santangelo reported that Johnson's last visit had been in October 2011, *id.* at 193,

and it appears that he also saw Santangelo at that time. *See id.* at 157.

Santangelo observed that Johnson was diagnosed as HIV positive in 1999, but "never

really went for any care mostly because he was told he did not need treatment." *Id.* at 193.

---

[3] GAF is measured on a scale from 1 to 100, and is used to rate subjectively the social,
occupational, and psychological functioning of adults. *See* American Psychiatric Association,
*Diagnostic and Statistical Manual of Mental Disorders*, at 34 (2013). A GAF of 51-60
suggests moderate symptoms that present a moderate difficulty in social, occupational, or
school functioning, while a GAF of 61-70 suggests mild symptoms. *Id.*

However, she also indicated that Johnson "does not want [HIV] medications at this time due to social issues [and] housing problems." *Id.* Santangelo noted that Johnson's previous CD4 count was 616,[4] his viral load was 1,535,[5] and he is PPD positive.[6] *Id.* at 193-94. Johnson reported knee and back pain, including that, as a result of his weight gain, he "cannot even walk two blocks without sitting." *Id.* Accordingly, Santangelo referred Johnson to radiology for testing of his spine, the results of which were normal except for a "mild degenerative endplate osteophyte formation." *Id.* at 200. With respect to Johnson's hypertension, Santangelo advised him to continue taking his medication and discussed "lifestyle modifications" and a reference to a nutritionist. *Id.* at 194. Despite elevated blood pressure, Johnson's cardiovascular and respiratory systems were normal. *Id.* at 197. Finally, she noted that Johnson was "[t]rying hard to get back into care seeing psychiatry," and referred him for a mental health evaluation. *Id.* at 193-94.

### iii. HIV Medical Report

Santangelo and Dr. Faisal Chaudhry completed an SSA form pertaining to Johnson called an "HIV Medical Report" dated October 5, 2012. *Id.* at 202-08. The report appears to have been

---

[4] CD4 cells are a type of cell in the immune system. A normal CD4 count is from 500 to 1,500 cells/mm3 of blood. A lower than normal CD4 cell count may indicate that the HIV virus is damaging the immune system. When an individual's CD4 count gets too low, the risk of infection and certain types of cancer increases. *See* Jatin M. Vyas, *HIV/AIDS*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/000594.htm (last updated May 12, 2014).

[5] The HIV viral load test is used to monitor HIV infection by reporting how many copies of the virus are present in the blood. Maintaining a lower viral load can decrease the complications from HIV and slow the progression from HIV to AIDS. *HIV Viral Load*, LAB TESTS ONLINE, http://labtestsonline.org/understanding/analytes/viral-load/tab/test (last updated Dec. 29, 2014).

[6] When individuals are infected with the bacteria that cause tuberculosis, they are classified as "Purified Protein Derivative" ("PPD") positive. Jatin M. Vyas, *PPD Skin Test*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003839.htm (last updated Nov. 20, 2013).

completed by Santangelo with respect to Johnson's physical condition and by Dr. Chaudhry with respect to his mental condition.

Santangelo listed diagnoses of HIV positive status, hypertension, and back pain. *Id.* at 202. Santangelo noted an absolute CD4 count of 686, a T4/T8 ratio of 0.707,[7] and a viral load of 806. *Id.* at 203. She also noted that Johnson was not on medication for his HIV, but had not had any opportunistic infections. *Id.* Santangelo concluded that the effects of Johnson's conditions on his daily living activities were that his standing and walking were each limited by fatigue to two hours per day during an eight-hour day, he was limited to lift and carry up to 20 pounds for two blocks, and was not limited when sitting. *Id.* at 204. By contrast, with regard to Johnson's ability to perform work-related activities, Santangelo concluded that Johnson's ability to stand and/or walk was limited to six hours per day, he was limited to lift and carry a maximum of 25 pounds up to two hours per day, and could sit a maximum of six hours per day. *Id.* at 205. She found that he had no limitation in his ability to push and pull. *Id.* Santangelo also determined that Johnson had no limitations or difficulties in his ability to travel, understand, remember or carry out instructions, or respond in a professional setting. *Id.* at 204.

In the same HIV Medical Report, when evaluating Johnson's mental ability to perform work-related activities, Dr. Chaudhry concluded that Johnson had no limitations in understanding and memory or adaptation. *Id.* at 207. However, Dr. Chaudhry also found that Johnson "has mental health issues that interfere with [his] ability to be punctual" and "chronic

---

[7] T4 cells are white blood cells that are the primary target of HIV. T8 cells are referred to as "suppressor cells" or "killer T-cells." Because individuals with HIV usually have a lower than normal T4 count and a higher than normal T8 count, the ratio of someone's T4 to T8 count is usually much lower than normal. A normal ratio is between 0.9 and 6.0. *See T-Cell Test Definitions*, AIDSMEDS, http://www.aidsmeds.com/articles/TandHIV_10809.shtml (last visited Jan. 6, 2015).

pain issues [that] affect his ability to be relaxed and calm and to focus. He gets intermittent depression." *Id.* at 206-07. Dr. Chaudhry estimated that Johnson would be absent from work due to physical or mental problems approximately three times each month. *Id.* at 206.

### b.   Consultative Examinations

#### i. Dr. Christopher Flach

On December 6, 2011, Dr. Christopher Flach performed a consultative psychiatric evaluation of Johnson. *Id.* at 162-65. Johnson reported to Dr. Flach that he had no depressive symptoms, anxiety, or manic symptoms. *Id.* at 162. Dr. Flach observed that, during the examination, Johnson was cooperative, maintained good eye contact, was fluent in his speech, had a coherent and goal-directed thought-process, a neutral mood, and intact attention and concentration with fair insight and judgment. *Id.* at 163-64. Dr. Flach also noted that Johnson seemed lethargic, his affect was flat, his cognitive functioning was below average, his recent and remote memory was moderately impaired, and his orientation was off by time (Johnson said the year was 1911). *Id.*

Dr. Flach determined that Johnson was able to perform activities of daily living, including cooking, cleaning, shopping, and managing his own funds, and was able to tend to his personal needs, including dressing and bathing. *Id.* at 164-65. As part of the medical source statement, Dr. Flach concluded that Johnson "can follow and understand simple tasks independently," but has "mild problems" dealing with stress and maintaining attention and concentration. *Id.* at 164. He further reported that Johnson was "able to maintain a regular schedule, learn new tasks, perform complex tasks [and] make[] appropriate decisions and adequately relate to others." *Id.* Dr. Flach diagnosed Johnson with an adjustment disorder with "mixed emotions of anxiety and depression" and opiate dependence in "early full remission." *Id.*

7

### ii.  Dr. Vinod Thukral

That same day, Johnson also underwent a consultative physical examination by

Dr. Vinod Thukral. *Id.* at 166-71. Dr. Thukral gave Johnson a "fair" prognosis and diagnosed

him with "HIV disease by history, hypertension by history, lower backache by history, headache

by history, ex-heroin abuse by history, and decreased visual acuity in the right eye upon

examination." *Id.* at 169. With respect to his HIV, Johnson denied any history of opportunistic

infections, hospital admissions, or complications. *Id.* at 166. Johnson also discussed his history

of lower back pain, which he said is precipitated by standing for long periods, bending, lifting,

pushing, and pulling. *Id.* Johnson described the pain as "dull" and "intermittent," and said that

he "gets some relief with rest and pain medication." *Id.* Dr. Thukral's examination of Johnson's

lumbar spine revealed full flexion, extension and lateral flexion bilaterally, full rotary movement

bilaterally, and negative straight leg-raising bilaterally. *Id.* at 168. Dr. Thukral noted that

Johnson's blood pressure was elevated, and despite the fact that Johnson was asymptomatic,

Dr. Thukral referred him to the emergency room for uncontrolled hypertension. *Id.* at 167.

Dr. Thukral noted that, during the physical examination, Johnson appeared to be in no

acute distress. *Id.* Dr. Thukral observed that Johnson had a normal gait, was able to walk on his

heels and toes without difficulty, squat fully, rise from his chair without difficulty, and did not

need help changing or getting on and off the examination table. *Id.* Johnson reported that he

could perform activities of daily living, including cooking, cleaning, shopping, doing laundry,

showering, bathing, and dressing himself. *Id.* Dr. Thukral concluded that Johnson had "no

limitations for sitting, standing, bending, pushing, pulling, lifting, carrying, or any other such

related activities." *Id.* at 169.

8

### c.    Assessments by Non-Examining Sources

On January 3, 2012, K. Jones, an SSA employee, reviewed Johnson's medical file and completed a Physical Residual Functional Capacity Assessment form. *Id.* at 33-38. Jones found that Johnson could occasionally lift up to 50 pounds and frequently lift and carry up to 25 pounds, stand and/or walk for six hours, and sit for six hours in an eight-hour work day. *Id.* at 34. Jones concluded that Johnson "does have a medically determinable impairment which could reasonably be expected to cause some limitations in performing work-related activities," but the impairment is "not to the degree alleged," particularly because Johnson's statements regarding the "intensity, frequency [and] duration" of his symptoms were "disproportionate with the total medical [and] non medical evidence in [the] file." *Id.* at 36-37.

On January 6, 2012, state agency psychiatric consultant Dr. M. Apacible reviewed Johnson's medical file and completed a Psychiatric Review Technique form. *Id.* at 172-85. Dr. Apacible concluded that neither Johnson's "Affective Disorders" nor "Substance Addiction Disorders," constituted severe mental impairments. *Id.* at 172.

### 3.    Hearing Before the ALJ

ALJ Hornblass held a hearing on November 27, 2012 to assess Johnson's eligibility for DIB and SSI. *Id.* at 20-31. Johnson appeared at the hearing with a non-attorney representative and was the only person to testify. *Id.* The ALJ elicited testimony from Johnson about his living situation and daily activities, which included shopping for and preparing his own food, watching television, and going to the park. *Id.* at 22-23, 26-27, 30. The ALJ also inquired into Johnson's drug use, including his heroin addiction and alcohol consumption, which Johnson denied as of the date of the hearing. *Id.* at 26.

Johnson testified that he sees a psychiatrist once per month and a doctor every three weeks, *id.* at 30, and explained that his doctor informed him that he cannot work due to "chronic disease of [his] knees and lower back pain." *Id.* at 25. Johnson's representative asked him to further describe the conditions that interfere with his ability to work. Johnson identified his "lower back" and his "knees, [which] give out sometimes . . . and sometimes I can't get up out of bed." *Id.* at 27. However, Johnson also said that he can walk seven or eight blocks before getting fatigued. *Id.* at 28. After Johnson described his physical and mental health as "fairly good," the ALJ asked Johnson about his ability to walk, lift objects, push, squat, and bend, to which he responded that he could walk for "a few blocks" and lift objects that are "not too heavy," but cannot squat or bend down. *Id.* at 28-29.

## II.   DISCUSSION

### A.   Legal Standards

#### 1.   Judicial Review of Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U. S. 389, 401 (1971)) (internal quotation marks and alterations omitted). In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory

10

evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Kirkland v. Astrue*, No. 06-CV-4861 (ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts*, 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### 2.    Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the

individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In general, when assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)); *see also Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur*, 722 F.2d at 1037 (citations omitted).

### a.   **Five-Step Inquiry**

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves on to the third step, considering whether the claimant has an impairment that is listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P (a "Listing"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.*; 20 C.F.R.

§ 404.1520(d). If not, the Commissioner continues on to the fourth step, determining whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step, ascertaining whether the claimant possesses the ability to perform any other work, 20 C.F.R. § 404.1520(a)(4)(v), typically by relying on the applicable medical vocational guidelines, known as the "Grids." *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (citing *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

The claimant bears the burden of proving disability in steps one through four of the sequential analysis. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner on the fifth and final step, where she must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.    Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to "develop a complete medical record before making a disability determination." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)). This responsibility "encompasses not only the

13

duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has met his duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). This imperative remains in force even where the claimant is represented by counsel. *Perez*, 77 F.3d at 47.

### c.    Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)). However, a treating physician's opinion is given controlling weight—that is, it is binding—provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

14

Case 1:14-cv-02334-CM-JLC  Document 14  Filed 01/30/15  Page 15 of 34

record." 20 C.F.R. § 404.1527(c)(2); *see also Selian*, 708 F.3d at 418 ("The opinion of a treating

physician on the nature or severity of a claimant's impairments is binding if it is supported by

medical evidence and not contradicted by substantial evidence in the record.") (citing *Burgess*,

537 F.3d at 128 and *Green-Younger v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003)). The

regulations define a treating physician as the claimant's "own physician, psychologist, or other

acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation

and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R.

§ 404.1502. Deference to such medical providers is appropriate because they "are likely to be

the medical professionals most able to provide a detailed, longitudinal picture of [the] medical

impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical evidence alone or from reports of individual examinations."

20 C.F.R. § 404.1527(c)(2).

　　　　Under certain circumstances, however, a treating physician's opinion will not be

controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work'

is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*,

No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A

treating physician's statement that the claimant is disabled cannot itself be determinative.").

Additionally, where "the treating physician issued opinions that [were] not consistent with other

substantial evidence in the record, such as the opinion of other medical experts, the treating

physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at

*15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks

omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician *sua sponte* if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider several factors that have been enumerated by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also* 20 C.F.R. § 404.1527(c)(2). If, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative

16

decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referencing *Schaal*, 134 F.3d at 505, and 20 C.F.R. § 404.1527(d)(2)).[8] The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, courts "have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (alteration in original) (internal quotation marks omitted).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its own judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Id.* (quoting *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)).

### d.  Claimant's Credibility

As to the credibility of a claimant, here too, the reviewing court must defer to an ALJ's findings. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are 'medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain.'"

---

[8] On March 26, 2012, a portion of 20 C.F.R. § 404.1527 was modified. The section that described the factors for an ALJ to consider when deciding how to weigh a treating physician's opinion was moved from subsection (d)(2) to (c)(2).

17

*Vargas v. Astrue*, No. 10-CV-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v. Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams*, 859 F.2d at 260-61).

Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If the answer to the first step of the analysis is yes, the ALJ proceeds to the second step, considering "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (citing 20 C.F.R. § 404.1529(a)) (internal quotation marks omitted). Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," the ALJ may take into account a variety of other considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that aggravate the symptoms; treatment and medication necessitated by the pain or other symptoms

18

and their effects; other alleviating measures taken by the claimant; and other factors that relate to the claimant's functional limitations and restrictions stemming from pain or other symptoms. *Id.* (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B.    The ALJ's Decision**

In a decision dated January 8, 2013, the ALJ determined that Johnson was not disabled as defined by the Social Security Act and applicable regulations, and therefore denied Johnson's claims for DIB and SSI. R. at 11-17. Following the five-step inquiry into disability, the ALJ first determined that Johnson had not been engaged in substantial gainful activity since November 10, 2010, the date Johnson claimed as the start of his disability. *Id.* at 13. At step two, the ALJ found that Johnson had the following severe impairments: HIV, hypertension, and lower back pain. *Id.* At step three, the ALJ determined, in summary fashion, that none of these impairments met or was medically equal to the severity of a Listing. *Id.*

The ALJ then moved on to step four and found that Johnson had the RFC for the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but did not have the RFC to perform his past work as a mover and stock clerk. *Id.* at 14-16. In reaching this conclusion, the ALJ discredited Johnson's statements about his symptoms to the extent they were inconsistent with the ALJ's RFC assessment. *Id.* at 16. Finally, at step five, with reference to the Grids, the ALJ determined that, given Johnson's age, education, and work experience, there were a significant number of jobs in the national economy he could perform. *Id.* at 16-17.[9]

---

[9] The "Grids" are found in 20 C.F.R. § 404, Subpt. P, Appx. 2. Table 2 of the Grids is applicable where a claimant has the RFC to perform light work.

19

## C.   Analysis

Although Johnson has not submitted any opposition to the Commissioner's motion, the
Court liberally construes his complaint to raise the strongest arguments it suggests, specifically
that the ALJ did not comply with the applicable legal standards and made a determination that
was not supported by substantial evidence. *See, e.g.*, *Wellington v. Astrue*, No. 12-CV-3523
(KBF), 2013 WL 1944472, at *3 (S.D.N.Y. May 9, 2013). Johnson's form complaint uses the
boilerplate language alleging that the ALJ's decision was not supported by substantial evidence.
Compl., ¶ 9. The Court takes this general allegation specifically to be a challenge to the ALJ's
determinations at steps three through five which, unlike steps one and two, were not decided in
Johnson's favor. Upon review of the record, the Court finds that, while there is substantial
evidence to support the ALJ's step three determination, in reaching his RFC conclusion at step
four, the ALJ failed to engage in the required analysis of Johnson's limitations. This deficiency,
in turn, precludes the Court's review of the ALJ's analysis at step five. Therefore, the Court
recommends that the case be remanded.

### 1.   There Are Gaps in the Medical Record

As an initial matter, it appears that the ALJ did not fulfill his duty to develop the record.
While there is no indication that Johnson sought any additional time or assistance to submit
further documents or evidence for consideration, *see, e.g., Lynn v. Comm'r of Soc. Sec.*, No. 11-
CV-917 (CBA), 2013 WL 1334030, at *13 (E.D.N.Y. Mar. 30, 2013) (ALJ "entitled to make a
decision based on the available record" where he requested psychiatric records, allowed their
submission, and claimant made no requests for additional time) (citing 20 C.F.R. § 404.1516),
there appear to be gaps in Johnson's medical records.

20

First, with the exception of the single treatment note from Santangelo on October 3, 2012 and Johnson's records from his hospitalization at Woodhull for heroin detoxification, the record contains no treatment notes. However, on multiple occasions Johnson reported that he regularly saw both a psychiatrist and one or more medical doctors. *See, e.g.*, R. at 26 (at administrative hearing, Johnson said he saw "a psych and my doctor"). In his SSA Disability Report, Johnson listed a "Dr. Martinez" at Woodhull, who he said treated him "for [his] HIV condition." *Id.* at 112. In the notes from his consultative examination, Dr. Thukral mentioned that Johnson "is being followed by the infectious disease doctor every month." *Id.* at 166. It is not clear from the record if Dr. Martinez and the infectious disease doctor are the same person or if the ALJ sought medical records from this person or persons. Similarly, while Dr. Chaudhry completed a portion of the HIV Medical Report and noted that he treats Johnson, the record contains none of his treatment notes. *Id.* at 206-07; *see also id.* at 162 (Johnson reported he sees psychiatrist "once a month for at least two visits"). If the ALJ did not request such medical records in anticipation of the hearing, and there is no record that he did, his failure to do so is grounds in itself for a remand.[10]

## 2.    The ALJ's Step Three Determination Is Supported by Substantial Evidence

At step three, the ALJ concluded, in summary fashion and without discussion of the Listings, that Johnson did not have an impairment or combination of impairments that met or medically equaled a Listing. *Id.* at 13. While the ALJ's analysis was entirely lacking, the

---

[10] This would not be the first time that a court has remanded due to ALJ Hornblass' failure to develop the record. *See, e.g.*, *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704 (JPO) (SN), 2015 WL 321832, at *2-3 (S.D.N.Y. Jan. 23, 2015); *Armstrong v. Colvin*, No. 12-CV-8126 (VB), 2013 WL 6246491, at *18-19 (S.D.N.Y. Dec. 3, 2013); *Russo v. Astrue*, No. 12-CV-0035 (ENV), 2013 WL 2470306, at *5 (E.D.N.Y. June 7, 2013).

Court's own review of the record demonstrates that the ALJ's determination is supported by

substantial evidence.[11]

### a.   Lower Back Pain

The ALJ's conclusion that Johnson's lower back pain did not meet the criteria for a

Listing is supported by substantial evidence. To qualify as a listed impairment, disorders of the

musculoskeletal system, particularly of the spine, require evidence of:

> a. nerve root compression "characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor
> loss (atrophy with associated muscle weakness or muscle
> weakness) accompanied by sensory or reflex loss" and, if the
> injury involves the lower back, a "positive straight-leg raising
> test;"
> b. spinal arachnoiditis, confirmed by an operative note or
> pathology report, "manifested by severe burning or painful
> dysesthesia, resulting in the need for changes in position or
> posture more than once every two hours;" or
> c. lumbar spinal stenosis with "chronic nonradicular pain and
> weakness" which results in the inability to ambulate
> effectively, as defined by the regulations.

*See* 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 1.04.

First, there is no evidence in the record that Johnson has nerve root compression with

related sensory or reflex loss. *See, e.g.*, R. at 168 ("No sensory deficit noted."). Additionally,

during his consultative examination, Dr. Thukral found that Johnson had negative straight leg-

raising bilaterally, *id.*, which would preclude any existing nerve compression in the lower back

from qualifying as a Listing-level impairment. Second, there is no evidence in the record that

Johnson has spinal arachnoiditis, or if he did, that he experiences related severe burning or

---

[11] The ALJ's discussion of this issue consisted solely of a single sentence that "[m]edical
evidence from treating and examining physicians do not establish any listing level
impairment." R. at 13.

22

painful dysesthesia requiring him to switch positions every two hours. *See id.* at 121, 166
(describing his pain as an "ache" and "dull and intermittent").

Third, and finally, there is no evidence in the record that Johnson has lumbar spinal
stenosis. While the ache Johnson described in his lower back might be sufficiently severe, the
"discomfort" and "unpleasant sensations" associated with lumbar spinal stenosis usually radiate
from the lower back downwards, *see* 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 1.00(K)(3), which
Johnson's pain does not. *See* R. at 121. Moreover, Johnson's pain does not prevent him from
ambulating effectively, as required by the regulations. The regulations define an "inability to
ambulate effectively" as an "an extreme limitation of the ability to walk . . . generally [marked
by] insufficient lower extremity functioning to permit independent ambulation without the use of
a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R.
Pt. 404, Subpt. P, Appx. 1, § 1.00(B)(2)(b)(1) (internal citation omitted); *see also id.* at
§ 1.00(B)(2)(b)(2). Where, as here, a plaintiff has some ambulatory limitations, but regularly
engages in the activities of daily living such as cooking, cleaning, and shopping, courts routinely
find that the claimant can ambulate effectively and does not meet the requirements of the
applicable Listing. *See, e.g., DeJesus*, 762 F. Supp. 2d at 691 (back pain did not satisfy Listing
where plaintiff took short walks); *Paulino v. Astrue*, No. 08-CV-02813 (CM) (AJP), 2010 WL
3001752, at *15-16 (S.D.N.Y. July 30, 2010) (plaintiff with moderate limitations in walking long
distances could ambulate effectively because she walked without assistive device and could
climb stairs and take public transportation); *Marullo v. Astrue*, No. 08-CV-0818 (RJA) (LGF),
2010 WL 2869577, at *9 (W.D.N.Y. May 4, 2010) (plaintiff with difficulty walking long
distances who must sit when she experiences leg pain could still be deemed to ambulate
effectively under applicable regulations), *adopted by*, 2010 WL 2869574 (W.D.N.Y. July 20,

23

2010). The fact that Johnson occasionally uses a cane, R. at 27-28, is also not dispositive of

ineffective ambulation, as the regulations require a two-handed assistive device. *See* 20 C.F.R.

Pt. 404, Subpt. P, Appx. 1, § 1.00(B)(2)(b)(1)-(2).[12]

### b. Hypertension

The ALJ's determination regarding Johnson's hypertension is also supported by

substantial evidence. "Because hypertension (high blood pressure) generally causes disability

through its effects on other body systems," the regulations provide that it will be evaluated "by

reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when

considering its effects under the Listings." 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 4.00(H)(1).

Where a claimant's high blood pressure does not affect or impair other bodily systems, it does

---

[12] Although obesity is not itself a disability, *see* SSR 02-1p, 2000 WL 628049, at *5 (SSA Sept.
12, 2002), "when determining whether an individual with obesity has a listing-level
impairment . . . adjudicators must consider any additional and cumulative effects of obesity,"
particularly in the context of musculoskeletal disorders. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1,
§ 1.00(Q). This mandate also applies to steps four and five of the five-step analysis. *Id.* It is
clear from the record that Johnson is overweight. *See, e.g.*, R. at 167, 194, 198. Although the
ALJ did not explicitly discuss the effects, if any, of Johnson's weight on his lower-back pain,
he did mention that Dr. Chaudhry (although it was actually Santangelo) diagnosed Johnson as
"unspecified overweight" and cited to other medical records that refer to Johnson's obesity.
*See id.* at 14-15. Where, as here, an ALJ cites to medical records that discuss a claimant's
weight and reaches a conclusion in accord with those medical records, some courts have found
that an ALJ may be considered to have "implicitly factored [the claimant's] obesity" into his
determination. *Restuccia v. Colvin*, No. 13-CV-3294 (RMB), 2014 WL 4739318, at *5
(S.D.N.Y. Sept. 22, 2014) (with respect to ALJ's RFC determination) (quoting *Drake v.
Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011)) (internal quotation marks omitted); *see also
Cruz v. Astrue*, 941 F. Supp. 2d 483, 499 (S.D.N.Y. 2013); *Guadalupe v. Barnhart*, No. 04-
CV-7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005). However, because the
Court recommends a remand here, the ALJ should be encouraged to make explicit findings on
this issue upon further review.

24

not meet the criteria for a Listing. *See Rosado v. Astrue*, 713 F. Supp. 2d 347, 362 (S.D.N.Y. 2010); *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 275 (S.D.N.Y. 2009).

Johnson reported that his hypertension began in 2006—before the alleged disability onset date, during which time Johnson was gainfully employed—and that he takes medication for it. R. at 166, 193; *see, e.g.*, *Maurice v. Colvin*, No. 12-CV-2114 (LGS) (FM), 2014 WL 2967442, at *16 (S.D.N.Y. July 2, 2014) (hypertension predated alleged disability), *adopted by*, 2014 WL 5410004 (S.D.N.Y. Oct. 23, 2014). During his consultative examination, Johnson denied any resulting complications, *id.* at 166, and generally appeared to be asymptomatic. *See, e.g.*, R. at 151-52 (high blood pressure but no effect noted during physical examination), 194-97 (high blood pressure but normal respiratory and cardiovascular systems). Emblematic of Johnson's complete lack of hypertensive symptoms, while Dr. Thukral referred Johnson to the emergency room because his blood pressure was high, he nevertheless noted that Johnson was asymptomatic during the consultative examination. *Id.* at 167.

Additionally, courts in this Circuit have found that hypertension did not meet the criteria for a Listing where there was "limited evidence that [claimant's] hypertension restricted his lifestyle" and the claimant "testified that he could engage in a range of daily activities, including household chores, personal hygiene and socialization." *Mejia v. Astrue*, 719 F. Supp. 2d 328, 341 (S.D.N.Y. 2010); *accord Paulino*, 2014 WL 2120544, at *13; *Lundy v. Massanari*, No. 01-CV-0102 (JG), 2001 WL 826707, at *3 (E.D.N.Y. July 10, 2001). Because there is a lack of evidence that Johnson's hypertension affected his bodily systems and because his daily activities include a range of non-strenuous activities, the ALJ properly concluded that Johnson's hypertension was not disabling.

### c.    HIV

Finally, the ALJ's conclusion that Johnson's HIV did not meet the criteria for a Listing is supported by substantial evidence.  To be found disabled, a claimant who has proper documentation of his HIV status must demonstrate that he has at least one other medical condition among a list ranging from bacterial and fungal infections and certain cancers to HIV wasting syndrome and cardiomyopathy.  *See* 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 14.08. There is no evidence in the record that Johnson has any of the medical conditions listed in § 14.08(A)-(J), and "the ALJ was entitled to rely on that absence of evidence of disability." *Alvarez v. Barnhart*, No. 02-CV-3121 (JSM) (AJP), 2002 WL 31663570, at *10 (S.D.N.Y. Nov. 26, 2002) (collecting cases), *adopted by*, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003).

In contrast to the medical conditions listed in § 14.08(A)-(J), the record contains some evidence that Johnson experienced symptoms appearing in subsection (K).  However, none of Johnson's symptoms has the requisite relationship, severity, or frequency, such that Johnson's HIV would qualify as a Listing.  Section 14.08(K) relates to "repeated . . . manifestations of HIV infection," including "cognitive or other mental limitations."  While doctors noted Johnson's mental limitations, *see* R. at 164, 206-07, there is no evidence in the record to suggest that Johnson's cognitive limitations are manifestations of his HIV, as opposed to an unrelated issue. *See, e.g.*, *id.* at 166 (Johnson denied any complications due to his HIV).  Even if there were such evidence, subsection (K) also requires that any manifestation results in "significant documented symptoms or signs" together with marked limitations in (1) the "activities of daily living;" (2) "maintaining social functioning;" or (3) "completing tasks in a timely manner due to deficiencies in concentration, persistence or pace."  20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 14.08(K).  Again, while the record contains evidence that Johnson has reported symptoms and

26

signs listed in this provision, specifically pain, difficulty sleeping, and headaches, nothing indicates that these symptoms are the result of a manifestation of his HIV. *See* R. at 162 (history of difficulty sleeping and pain at night), 166 (history of headaches once a month for five years). Moreover, while both Drs. Flach and Chaudhry determined that Johnson has some issues with punctuality and concentration, *id.* at 164, 206-07, they may not rise to the level of a "marked" limitation. *Compare* 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, § 14.00(I)(5) ("marked limitation" must "seriously interfere with [claimant's] ability to function independently, appropriately, and effectively"), *with* R. at 206 (noting Johnson's chronic pain causes depression, but he "copes"), *id.* at 164 (describing problems as "mild").[13]

### 3.    The ALJ Failed to Explain the Reasons for His RFC Determination

At step four, the ALJ determined that Johnson retained the RFC to perform the full range of light work. *Id.* at 14. However, in reaching his RFC conclusion, the ALJ simply restated the entire medical record without any analysis, including any indication of how he evaluated and weighed the medical evidence, and without making any findings with respect to Johnson's abilities on a function-by-function basis. *Id.* at 14-16. The absence of analysis at this step provides the Court with no basis on which to evaluate whether the ALJ's RFC determination was supported by substantial evidence, and accordingly, the case should be remanded on this ground as well.

In reaching a conclusion about a claimant's RFC, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities *on a function-by-function* basis." SSR 96-8p, 1996 WL 374184, at *1 (SSA July 2, 1996) (emphasis

---

[13] Were the ALJ to receive additional medical records from Dr. Chaudhry and/or Johnson's infectious disease doctor on remand, as discussed in the preceding section, the results of this analysis may be different.

27

added).  Among the functions an ALJ must consider are physical abilities, such as "sitting,

standing, walking, lifting, carrying, pushing, pulling, or other physical functions" and mental

abilities such as "understanding, remembering, [and] carrying out instructions."  20 CFR

§§ 404.1545, 416.945.  Moreover, "[t]he RFC assessment must include a narrative discussion

describing how the evidence supports each conclusion," and in so doing, the ALJ "must also

explain how any material inconsistencies or ambiguities in the evidence in the case record were

considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.

    The Second Circuit recently held that, despite the language of SSR 96-8p, an ALJ's

failure to perform a function-by-function analysis at step four does not automatically require

remand.  *See Cichocki*, 729 F.3d at 177.  The Court explained that,

> [w]here an ALJ's analysis at Step Four regarding a claimant's
> functional limitations and restrictions affords an adequate basis for
> meaningful judicial review, applies the proper legal standards, and
> is supported by substantial evidence such that additional analysis
> would be unnecessary or superfluous . . . remand is not necessary
> merely because an explicit function-by-function analysis was not
> performed.

*Id.*  However, the Court reiterated that, "where [a court is] 'unable to fathom the ALJ's rationale

in relation to evidence in the record, especially where credibility determinations and inference

drawing is required of the ALJ,' we will not 'hesitate to remand for further findings or a clearer

explanation for the decision.'"  *Id.* (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.

1982)); *accord Abbott v. Colvin*, No. 13-CV-4893, 2015 WL 74073, at *2 (2d Cir. Jan. 7, 2015)

(remanding where step four analysis was insufficiently detailed).

    Here, the ALJ determined that Johnson had the RFC to perform light work.  R. at 14.[14]  In

reaching this conclusion, the ALJ merely summarized the medical evidence in the record.  *Id.*

---

[14] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is

28

at 14-16. Although the ALJ recited in some detail the medical records presented, he did nothing more than transcribe the findings therein and provided no basis for the Court "to glean the rationale" for his decision. *Mongeur*, 722 F.2d at 1040. The ALJ did not explain whether he gave certain of the medical opinions more weight than others, despite the fact that they are not completely in accord with one another and, in some instances, are internally inconsistent. *Compare id.* at 204-05 (Santangelo found physical limitations), *with* 169 (Dr. Thukral found no physical limitations); *compare id.* at 206-07 (Dr. Chaudhry noted "poor" ability to "perform activities within a schedule, maintain regular attendance, and be punctual"), *with id.* at 164 (Dr. Flach found that Johnson was "able to maintain a regular schedule").

The report completed by Santangelo is illustrative of the difficulties faced by a court where an ALJ provides no analysis. First, it bears noting that the ALJ erroneously identified the medical records and SSA form completed by Santangelo as having been completed by Dr. Chaudhry and vice versa. *Id.* at 14-16. Importantly, here, Santangelo is a nurse practitioner whose opinion does not automatically receive the high level of deference accorded to a treating source. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008); *Mongeur*, 722 F.2d at 1039 n.2; 20 C.F.R. §§ 404.1513(a), 416.913(a) (defining "acceptable medical sources"); 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (defining "other sources" to include nurse practitioners). Second, her assessment of Johnson's physical limitations is more restrictive than that of Dr. Thukral, who found no limitation of any kind. *Compare* R. at 204-05, *with id.* at 169.

---

in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

Therefore, Santangelo's opinion must have factored into the ALJ's determination that Johnson

had the RFC for light work only, as opposed to the ability to perform the full range of work.

However, without explanation, Santangelo found that Johnson's ability to sit, stand, walk, and

lift were less restricted in the context of work activity than in daily living activity. *Compare id.*

at 204, *with id.* at 205. While Santangelo's finding with respect to Johnson's work capabilities

seems consistent with light work, her finding as to Johnson's capabilities in daily life may not be.

It is not clear to the Court how to bring these findings into accord, and the ALJ did not make

explicit any effort he undertook to reconcile them in reaching his conclusion. *See, e.g., Box v.*

*Colvin*, 3 F. Supp. 3d 27, 45-46 (E.D.N.Y. 2014) (remanding where ALJ did not reconcile

conflicting evidence); *Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL

1599944, at *9 (E.D.N.Y. Apr. 21, 2014) (remanding where ALJ merely restated medical

evidence without connecting to RFC finding). Additionally, as noted, the ALJ also identified

portions of Dr. Chaudhry's opinion as belonging to Santangelo, *see* R. at 15-16, which may

mean that the ALJ did not accord Dr. Chaudhry's opinion regarding Johnson's need to miss work

sufficient deference, particularly as weighed against Dr. Flach's findings. However, without

analysis, it is impossible for the Court to determine whether the ALJ "applie[d] the proper legal

standards." *Cichocki*, 729 F.3d at 177; *see, e.g., Box*, 3 F. Supp. 3d at 45-46 (remanding where

ALJ did not address doctor's opinion that plaintiff would miss work twice per month due to

impairment).

Not only is it difficult to discern how the ALJ weighed the medical evidence, but his

assessment of Johnson's credibility is also opaque. While the ALJ's discussion of Johnson's

credibility is the only analysis he explicitly performed at step four, his finding that Johnson's

"statements concerning the intensity, persistence and limiting effects of [his] symptoms are not

Case 1:14-cv-02334-CM-JLC  Document 14  Filed 01/30/15  Page 31 of 34

credible to the extent they are inconsistent with" the ALJ's RFC determination reflects a

misunderstanding of the required analysis at this step. R. at 16. Courts have observed that using

what has become SSA "boilerplate" language "essentially reverse[s] the standard by finding that

[a claimant] was not credible because [the claimant's] complaints were not compatible with [the

ALJ's] own RFC determination, as opposed to the objective record evidence." *Molina v. Colvin*,

No. 13-CV-4989 (AJP), 2014 WL 3445335, at *14 & n.19 (S.D.N.Y. July 15, 2014) (collecting

cases). Because an RFC determination is supposed to take into account both the objective and

subjective medical evidence, "it makes little sense to decide on a claimant's RFC prior to

assessing her credibility." *Otero v. Colvin*, No. 12-CV-4757 (JG), 2013 WL 1148769, at *7

(E.D.N.Y. Mar. 19, 2013).

### 4. There Is an Insufficient Basis on Which to Evaluate the ALJ's Step Five Determination

Although the Court is recommending a remand on the basis of the ALJ's step four

determination, in the interest of completeness, the Court will briefly consider the ALJ's step five

analysis as well. This assessment is constrained, however, because the ALJ did not articulate his

reasoning at step four. Therefore, the Court cannot determine whether he appropriately relied on

the Grids at step five.

Generally, at step five, the Commissioner satisfies her burden of establishing a claimant's

capacity to perform available work by relying on the Grids. *See Rosa*, 168 F.3d at 78 (citing

*Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)). However, the Grids do not apply in cases

"where the claimant exhibits a significant non-exertional impairment (*i.e.*, an impairment not

related to strength)." *Selian*, 708 F.3d at 421. A non-exertional impairment is considered

significant when it has more than a negligible impact on a claimant's ability to perform the full

range of work; that is, it "so narrows a claimant's possible range of work as to deprive him of a

meaningful employment opportunity." *Selian*, 708 F.3d at 421 (quoting *Zabala v. Astrue*, 595

F.3d 402, 411 (2d Cir. 2010)). In such instances, instead of looking to the Grids, the ALJ must

consult with a vocational expert. *See Zabala*, 595 F.3d at 410 (citing *Bapp*, 802 F.2d at 605).

Johnson's cognitive and mental health issues are non-exertional impairments. See 20

C.F.R. §§ 404.1569a(c), 416.969a(c). The question, therefore, is whether these impairments are

of such gravity that the ALJ's exclusive reliance on the Grids would be inappropriate. As

described above, there is some disagreement between Dr. Chaudhry and Dr. Flach's mental

assessments. Both doctors noted that Johnson had difficulty maintaining attention and

concentration. *See* R. at 164, 206-07. However, while Dr. Flach described the problem as

"mild," and said Johnson would be able to maintain a regular schedule, Dr. Chaudhry described

Johnson's ability to perform activities within a schedule, maintain regular attendance, and be

punctual as "poor," and predicted that it would cause Johnson to miss work three times each

month. *Id.* Because the ALJ erroneously attributed at least part of Dr. Chaudhry's findings to

Santangelo, *id.* at 15-16, he did not go through the analysis that would ordinarily be required to

discount the opinion of a treating physician. Therefore, the Court cannot determine whether or

to what extent the ALJ considered Dr. Chaudhry's determination that Johnson had "poor" ability

to function in a working environment when deciding whether consultation with a vocational

expert was required. *See, e.g., Williams v. Astrue*, No. 09-CV-3997 (KAM), 2010 WL 5126208,

at *21-22 (E.D.N.Y. Dec. 9, 2010) (remanding because plaintiff had non-exertional impairments

and ALJ made errors at previous steps in analysis); *Baldwin v. Astrue*, No. 07-CV-6958(RJH)

(MHD), 2009 WL 4931363, at *27-28 (S.D.N.Y. Dec. 21, 2009) (remanding for failure to

consult vocational expert where evidence of "moderate" limitations in social functioning).

32

### III.    CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be denied, and the case be remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).  Specifically, I recommend that, on remand, the ALJ should:

1.      request treatment notes from all of Johnson's treating physicians, including Dr. Chaudhry and whoever regularly treats Johnson for his HIV, if the ALJ did not already do so, in order to fully develop the record;

2.      explain his conclusions regarding any limitations to Johnson's physical and mental capabilities at step four; and

3.      consider whether, in light of the ALJ's new step four analysis, reference to a vocational expert is required at step five.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge McMahon.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson,*

*Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

      If Johnson does not have access to cases cited herein that are unreported or available only

on a computerized database, he should request copies from counsel for the Commissioner. *See*

Local Civil Rule of the Southern and Eastern Districts of New York 7.2; *accord Lebron v.*

*Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
      January 30, 2015

                                    JAMES L. COTT
                                    United States Magistrate Judge

**A copy of this Report & Recommendation has been sent by regular mail to:**

Derick Johnson
3520 Dekalb Avenue
Apt. 4G
Bronx, New York  10467

34